**Annmarie LOWE and Marie Delisi, Plaintiffs–Appellants,**

v.

**COMMACK UNION FREE SCHOOL DISTRICT, Joseph Del Rosso, as Superintendent of Schools, and Robert L. Davis, as Assistant Superintendent of Schools, Defendants–Appellees.**

No. 1285, Docket 89–7211.

United States Court of Appeals, Second Circuit.

Argued June 22, 1989.

Decided Sept. 21, 1989.

Frederic Block (Lane T. Maxson, Block, Amelkin & Hamburger, Smithtown, N.Y., of counsel), for plaintiffs-appellants.

Brian McCaffrey (Vanessa M. Sheehan, Pelletreau & Pelletreau, Patchogue, N.Y., of counsel), for defendants-appellees.

Before MESKILL, PIERCE and MAHONEY, Circuit Judges.

MESKILL, Circuit Judge:

Plaintiffs-appellants Annmarie Lowe and Marie Delisi appeal from a judgment entered following a jury trial in the United States District Court for the Eastern District of New York, Wexler, J. Having applied for and been denied positions as elementary school teachers with the Commack Union Free School District (the School District) for the 1986–87 school year, Lowe and Delisi brought this action against defendants-appellees the School District, Joseph Del Rosso, Superintendent of the School District, and Robert L. Davis, Assistant Superintendent of the School District. Lowe and Delisi alleged, *inter alia,* violations of section 4(a)(1) of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a)(1) (1982) (the ADEA). The jury returned a verdict in favor of defendants-appellees, and the district court or-

dered the complaint dismissed. Lowe and Delisi appeal from the judgment that followed.

We affirm.

## BACKGROUND

### A. *Prior Employment*

Annmarie Lowe was born on March 23, 1934. Lowe began substitute teaching in the School District in 1969. In 1971, the School District hired her as a full-time teacher. In 1974, she was granted tenure.

Marie Delisi was born on June 12, 1934. In 1970, the School District hired Delisi as an elementary school teacher. In 1973, she was granted tenure.

Both Lowe and Delisi continued to work for the School District as tenured elementary school teachers until 1976. In 1976 the School District faced declining enrollment and, consequently, a need to abolish some teaching positions. Because they had relatively little seniority, both Lowe and Delisi were "excessed" in 1976 pursuant to New York State law. *See* N.Y.Educ.Law § 2510(2) (McKinney 1981). Accordingly, they were placed on a "preferred eligible list." Those placed on this list would be rehired in order of seniority as vacancies occurred. N.Y.Educ.Law § 2510(3) (McKinney 1981 & Supp.1989). The rights accorded Lowe and Delisi to be rehired because of their placement on this list would expire after seven years. *Id.*[1]

While Lowe and Delisi waited for vacancies to occur, they both accepted positions in the School District as teacher assistants, positions paying far less than they had received as full-time teachers. Lowe and Delisi introduced evidence to show that while serving as teacher assistants, they performed many duties commensurate with those of full-time teachers. Throughout the seven years they remained on the preferred eligible list, no vacancies occurred, and their rights to be rehired lapsed in June 1983.

In November 1985, the Board of Education of the School District decided to adopt the New York State Retirement Incentive Program. Under this program, teachers age 55 or older were given incentives to retire. The decision to retire remained optional, but the School District anticipated that the adoption of the incentives would persuade some teachers to retire. Thus, it was expected that there would be vacancies for teaching positions for the 1986–87 school year. Apparently for this reason, the School District's Director of Personnel, Joseph Heinlein, sent a memorandum dated January 28, 1986 to the School District Superintendent, defendant-appellee Del Rosso. The memorandum recommended that the process for selection of teachers "should be based, wherever possible, on an objective evaluation of teacher qualifications." He recommended assessment of five areas—background and training, experience, personal and social characteristics, communication skills and physical fitness.

Defendant-appellee Davis became Assistant Superintendent of the School District in May 1986. Davis was instructed by Del Rosso to oversee the process for hiring teachers. Ultimately, the process overseen by Davis filled thirteen openings for the position of elementary teacher at the beginning of the 1986–87 school year. It is this process of selection that forms the basis of the instant suit.

### B. *The School District's Explanation of the Hiring Process for Elementary Teachers for the 1986–87 School Year*

According to evidence offered by the defendants, the process we describe below was devised and used to fill the thirteen elementary teacher positions vacant at the

---

1. In 1976, when Lowe and Delisi were excessed, placement on the preferred list was only to last for four years. In 1977, section 2510 was amended to enlarge the statutory period to six years, and in 1981, it was increased to seven years. Because Lowe and Delisi remained on the list throughout this period, they would appear to have benefited by both amendments. *Cf. Murphy v. Board of Educ.*, 104 A.D.2d 796, 797, 480 N.Y.S.2d 138, 139 (2d Dep't 1984) (1981 amendment not applicable to teacher whose preferred status had lapsed), *aff'd,* 64 N.Y.2d 856, 487 N.Y.S.2d 325, 476 N.E.2d 651 (1985).

beginning of the 1986–87 school year.[2] Two separate procedures were established, one for candidates previously employed by the School District as teacher assistants or substitute teachers (internal candidates), and one for applicants applying from outside the School District (external candidates).

### 1. *Screening of Internal Candidates*

All internal candidates were given the opportunity to be interviewed and to take a writing sample test. The interviews were conducted by six school administrators who were selected for the task because they were likely to have vacancies in their schools for the upcoming year. Each internal candidate was to be interviewed by two administrators in a single interview. The School District concedes that the interviewers were given wide discretion as to the substance of the interviews and the basis for evaluation of the candidates. One interviewer who interviewed both Lowe and Delisi testified that, in interviewing candidates generally, he asked questions "concerning firstly their knowledge of subject matter, secondly their ability to make provisions for group instruction, their ability to evaluate children in the classroom other than just a written test, and finally I seek to get from the candidate how well they can communicate to me and also to the children in the classroom." Each interviewer was to evaluate the candidate in terms of a rating of "Yes" or "No." No further evaluation of the candidates or explanation of the "Yes" or "No" evaluation was required.

The writing sample test, administered after the interviews, was designed to test the candidates' writing abilities and, to a lesser extent, their substantive knowledge of educational topics. Each sample was graded by an administrator who was unaware of the identity of the tested candidate. For purposes of grading the writing sample, writing ability constituted 7.5 points and the content of the writing constituted 5.0 points for a maximum score of 12.5.

Thirty-seven internal candidates decided to take part in this process, including Lowe and Delisi. The results of the interviews and writing samples were compiled by Davis during the summer of 1986. Davis then undertook to reduce the number of internal candidates by two-thirds pursuant to criteria he developed. Under his criteria, Davis examined each candidate's interview evaluations and writing sample score to determine whether he or she would be "in" or "out" of a remaining pool of eligible candidates (The Pool). Candidates who received two "Yes" evaluations in the interview and a writing sample score of 8.0 or higher would survive this cut and be placed in The Pool. Candidates who received one "Yes" and one "No" in the interview and who received a writing sample score of at least 9.0 would also make it into The Pool. No candidates who received two "No" evaluations in the interview would be placed in The Pool, regardless of their writing sample scores.

Of the thirty-seven internal candidates interviewed, two did not go on to complete the process by taking the writing sample test. Davis' application of his criteria eliminated from further consideration twenty-one more candidates, including Lowe and Delisi. The fourteen surviving candidates were placed in The Pool.

Lowe received two "No" evaluations from her interview and a writing sample score of 8.25. Thus, under the defendants' explanation of the process, Lowe was not placed in The Pool because no candidates with two "No" interview evaluations survived Davis' cut. Delisi received one "Yes" and one "No" and a score of 7.5. Thus, the defendants contend, Delisi was not placed in The Pool because her writing sample score was lower than the 9.0 required of candidates who had received one "Yes" and one "No" in their interviews. Both Lowe and Delisi were notified by letters dated July 23, 1986 that their "candidacy for an elementary teaching position for the 1986–87 school year [was] no longer under active consideration."

**2.** Twelve of the positions were filled effective September 1, 1986, the beginning of the 1986–87 school year, and a thirteenth was filled shortly thereafter, in November.

## 2. Screening of External Candidates

Over seven hundred external candidates applied for the thirteen positions. Davis requested the personnel office to narrow this field to one hundred by means of a "paper-screening" of the applications and resumes based on the candidates' experience, certifications and the schools they had attended. When Davis received these one hundred applications, he further narrowed the field to approximately thirty-five, again based only on their records. These thirty-five candidates were invited to be interviewed. Twenty-six of these external candidates were interviewed, all but one by Davis personally. One candidate, Robert Minott, was known by Davis, and Davis therefore arranged to have another official interview him.

Nine of the external candidates survived this interview process and went on to take a writing sample test. One candidate scored 8.75 on the sample, and all others scored 9.0 or above. The record is unclear as to whether these scores eliminated any of the nine external candidates from further consideration. Those who survived the writing sample test, however, were placed in The Pool together with the fourteen internal candidates.

## 3. Hiring of Teachers From The Pool

Once The Pool including both internal and external candidates was thus determined, candidates from The Pool were sent to particular principals of schools with vacancies. These principals interviewed candidates and made their recommendations to Davis. Davis testified that he accepted these recommendations, and hiring followed on that basis.

Eight internal candidates and five external candidates were selected from The Pool and hired to fill the thirteen elementary positions.

## C. Lowe's and Delisi's Challenge to the School District's Hiring Procedures

On October 16, 1987, Lowe and Delisi, represented by the same counsel, filed a complaint in the United States District Court for the Eastern District of New York naming the School District, Davis and Del Rosso as defendants. The plaintiffs alleged four causes of action. First, they alleged that the defendants' actions in failing to hire them constituted a violation of the ADEA, 29 U.S.C. § 623(a)(1). Second, they alleged violations of their civil rights under 42 U.S.C. §§ 1983, 1988 (1982). Third, they alleged a pendent state law claim based on N.Y.Exec.Law § 296(3–a) (McKinney 1982 & Supp.1989). Finally, they alleged another pendent state law claim based on N.Y.Educ.Law § 3027 (McKinney 1981). They sought appointment as elementary school teachers as of the commencement of the 1986–87 school year, together with back wages and benefits. They also sought liquidated damages under the ADEA, 29 U.S.C. § 626(b) (1982), compensatory damages, costs and attorney's fees. A jury trial was demanded.

The defendants filed a motion for summary judgment. After reviewing the parties' submissions, the district court denied the motion, stating that "[a]lthough defendants appear to have a strong defense, the Court cannot conclude that summary judgment is warranted."

The case was tried before a jury in January 1988.[3] Lowe and Delisi offered evidence designed to show that they had been denied employment on account of their ages. Both were 52 at the time teachers were hired for the start of the 1986–87 school year. Pointing to the adoption of the Retirement Incentive Program, they sought to convince the jury that the defendants did not want to hire teachers at or near the retirement age of 55 because to do so would be more expensive than hiring younger teachers. They argued that the defendants' explanation of their hiring procedures concealed their true intent, to replace the retiring teachers with younger teachers, not new teachers who themselves were approaching or had approached the

---

**3.** At trial, Lowe and Delisi did not press their claim under 42 U.S.C. §§ 1983, 1988, nor their pendent state law claims, focusing instead on their ADEA claim. No issue is raised in this appeal concerning these other claims.

retirement age of 55. They argued that this intent was revealed by the defendants' failure to follow the alleged process.

Much of the trial raised the question whether the defendants had in fact followed the procedures outlined above. For one example, one 55 year old internal candidate had received two "Yes" evaluations from her interview and a writing sample score of 9.5, yet she was not included in The Pool. Lowe and Delisi suggested that her age explained this exclusion, while the defendants responded that, her scores notwithstanding, she had been excluded due to an earlier disciplinary problem. Lowe and Delisi thus endeavored to use apparent discrepancies between the stated procedure and the hiring decisions actually made to persuade the jury that age was a factor considered in the hiring process. The defendants responded by seeking to explain all such discrepancies and maintaining that age had played no part in any hiring decisions.

The jury returned a verdict in favor of the defendants. The district court denied plaintiffs' motion to set aside the verdict. A final judgment was entered in favor of the defendants on January 30, 1988, and the complaint was dismissed with prejudice.

Lowe and Delisi appeal from the judgment of the district court. We affirm.

## DISCUSSION

Appellants raise four issues on appeal. First, they contend that the district court erred in failing to charge the jury that Lowe and Delisi could prove discrimination by demonstrating disparate impact. Second, they argue that with respect to the disparate treatment claim that was submitted to the jury, the district court's charge inadequately explained the role age had to have played in the hiring decision in order for them to recover. Third, they argue that the district court erroneously excluded from evidence a statement made by a School District official that would have strengthened the plaintiffs' case. Finally, they argue that the district court erred in responding to a jury question as to whether the jury would be able to express its feelings concerning the School District's hiring practices.

### A. The ADEA

■ Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); see Benjamin v. United Merchants and Mfrs., Inc., 873 F.2d 41, 42 (2d Cir.1989). Noting the Supreme Court's statement that " 'the [substantive] prohibitions of the ADEA were derived in haec verba from Title VII,' " we have determined that an ADEA violation may be demonstrated either by a showing of disparate treatment or disparate impact. Geller v. Markham, 635 F.2d 1027, 1032–35 (2d Cir. 1980) (quoting Lorillard v. Pons, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978)), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). "[E]vidence of the employer's subjective intent to discriminate" is required to support a claim based on disparate treatment, but is unnecessary to support a claim based on disparate impact. Wards Cove Packing Co. v. Atonio, —— U.S. ——, ——, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989); see also International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); Geller, 635 F.2d at 1031. "Either theory may, of course, be applied to a particular set of facts." Teamsters, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. "[T]hey merely represent alternative foundations upon which liability may be premised." Rowe v. Cleveland Pneumatic Co., 690 F.2d 88, 92 (6th Cir.1982) (per curiam).

### B. Disparate Impact

■ By emphasizing the defendants' allegedly discriminatory motives throughout the trial, Lowe and Delisi stressed the disparate treatment aspect of their case. Nevertheless, they also pressed their disparate impact claim at least as early as their opposition to the motion for summary

judgment. Under these circumstances, plaintiffs' having raised a disparate treatment claim did not preclude them from proving the alleged discrimination by means of a disparate impact claim. *See Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15; *Rowe*, 690 F.2d at 92; *cf. Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 605 (2d Cir.1986) (district court correctly refused to consider disparate impact claim after trial). Having offered some statistical evidence at trial, Lowe and Delisi specifically requested the district court to charge the jury that discrimination could be proved not only by a showing of disparate treatment, but, alternatively, by a showing of disparate impact. The district court refused to so instruct the jury. Lowe and Delisi maintain that this was error.

In seeking reversal and remand here, Lowe and Delisi expend much effort arguing that subjective hiring practices can form the basis of a disparate impact claim. The appellees do not dispute this point, as it is now established law. *See Watson v. Fort Worth Bank and Trust*, ⸺ U.S. ⸺, ⸺ – ⸺, 108 S.Ct. 2777, 2785–88, 101 L.Ed.2d 827 (1988). Indeed, there is no indication that the district court refused to give a disparate impact charge because the challenged hiring practices involved subjective determinations. Rather, it would appear, the district court refused to give a disparate impact charge because Lowe and Delisi failed to present a prima facie case.

Disparate impact "results from the use of 'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *Geller*, 635 F.2d at 1031 (quoting *Teamsters*, 431 U.S. at 336 n. 15, 97 S.Ct. at 1855 n. 15). As the Supreme Court has instructed, with respect to a disparate impact claim

> "the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged.... Especially in cases where an employer combines subjective criteria

with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."

*Wards Cove*, ⸺ U.S. at ⸺, 109 S.Ct. at 2124 (quoting *Watson*, ⸺ U.S. at ⸺ – ⸺, 108 S.Ct. at 2788) (O'Connor, J.) (plurality)). As Justice O'Connor stated in *Watson:*

> Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation.

⸺ U.S. at ⸺, 108 S.Ct. at 2788–89 (plurality); *see also Wards Cove*, ⸺ U.S. at ⸺, 109 S.Ct. at 2124.

As an initial matter, we question whether Lowe and Delisi adequately identified at trial "'the specific employment practice that is challenged.'" *Wards Cove*, ⸺ U.S. at ⸺, 109 S.Ct. at 2124 (quoting *Watson*, ⸺ U.S. at ⸺ – ⸺, 108 S.Ct. at 2788). Their purported statistical proof was little more than a compilation of the results of the hiring process. Even on appeal, they seem unable to meet their burden of "'isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Id.* (quoting *Watson*, ⸺ U.S. at ⸺, 108 S.Ct. at 2788).

In any event, we believe that regardless of which specific hiring practice is identified, Lowe and Delisi failed to demonstrate a prima facie case of disparate impact caused by that practice. That is, Lowe and Delisi failed to demonstrate that any of the defendants' hiring practices "caused the exclusion of applicants for jobs ... because

of their membership in a protected group." *Watson,* — U.S. at ——, 108 S.Ct. at 2789.

Under the ADEA, the protected group consists of "individuals who are at least 40 years of age." 29 U.S.C. § 631(a) (1982 & Supp. V 1987); *see Benjamin,* 873 F.2d at 42. Thus, Lowe and Delisi might have established a prima facie case of disparate impact by producing "statistics from which it may be inferred that [the School District's] selection methods or employment criteria result[ed] in employment of a larger share of ... teachers under 40 years of age[ ] than of ... teachers over 40" years of age. *See Geller,* 635 F.2d at 1032. This Lowe and Delisi did not do.

Under *Wards Cove* and *Watson,* Lowe and Delisi cannot satisfy the requirements of a prima facie case simply by broadly attacking as discriminatory the hiring process as a whole. The facts of this case seemingly could not support such a claim. Well over seven hundred applicants applied for the thirteen vacancies available at the beginning of the 1986–87 school year. Although specific data concerning the ages of the more than seven hundred external candidates was not presented, uncontradicted testimony indicated that most of these external applicants were likely young, as experienced teachers are less likely to apply to new school districts for jobs. Yet, of the thirteen candidates hired, eight were age 40 or over. If a majority of the applicants were under 40 and the overall hiring procedures used by the School District resulted in almost two-thirds of the positions being filled by those over 40, as appears to be the case here, it would seem that the procedures actually *favored* members of the protected group. Thus, the overall results of the process, without more, do not show disparate impact. Stated differently, the majority of applicants were not within the protected group, and yet nearly two-thirds of those hired by the challenged procedures came from the protected group. *Cf. Con-*

*necticut v. Teal,* 457 U.S. 440, 452–56, 102 S.Ct. 2525, 2533–35, 73 L.Ed.2d 130 (1982) (achieving a "bottom line" result of an appropriate racial balance does not justify discriminatory screening procedures).

At oral argument and in a letter submitted pursuant to Fed.R.App.P. 28(j), Lowe and Delisi suggest that, under *Wards Cove,* their suit can be viewed as challenging the specific procedures used to narrow the field of candidates for selection in The Pool. If discriminatory procedures were used to narrow the field of candidates, such procedures could not be justified merely because eight of the thirteen candidates ultimately hired were 40 or older. *See Teal,* 457 U.S. at 452–56, 102 S.Ct. at 2533–35. Accepting this position as correct, we nevertheless reject Lowe's and Delisi's argument that the procedures used to eliminate them from The Pool impacted disparately on the protected group. Whether one focuses on the evaluations of candidates' interviews, the grading of their writing samples or Davis' formulaic use of these measures to eliminate candidates from further consideration, Lowe and Delisi have not demonstrated that the challenged practice impacted disparately on members of the protected group of those 40 and over.

According to appellants' own trial exhibit, of the thirty-seven internal candidates who were interviewed, thirty-four were age 40 or over as of September 1, 1986, the date the positions were to be filled.[4] With all but three of the internal candidates being members of the protected group, we fail to see how any of the procedures used to narrow that field can be considered to have had a disparate impact on the protected group. Any comparison between the performances of the protected group members in the interview and on the writing sample with those of only three individuals from outside the group is statistically meaningless. For example, two of three

---

4. The record is unclear as to when the hiring decisions were actually made. *See Price Waterhouse v. Hopkins,* — U.S. ——, ——, 109 S.Ct. 1775, 1785–86, 104 L.Ed.2d 268 (1989) (plurality) (under Title VII, gender may not be considered at the time the employment decision is

made). Nevertheless, only one of the internal candidates turned 40 during the summer months and prior to September 1, 1986. Thus, depending on when the hiring decision was made, there could have been either three or four internal candidates who were under 40.

(66.6%) candidates under 40 received double "Yes" evaluations in their interviews. In contrast, of the thirty-four candidates who were age 40 or over, only sixteen (47%) received double "Yes" evaluations. Overall, the internal candidates under 40 received scores of Yes–Yes–9.0, Yes–Yes–8.0 and No–No–7.25, with only two of them making it into The Pool. These results do not support an inference that the hiring practices impacted adversely on their older competitors. To whatever extent they demonstrate any "disparity," it is not "sufficiently substantial" to support an inference of discrimination, *see Watson,* —— U.S. at ——, 108 S.Ct. at 2788–89, particularly in light of the unreliability of such a small statistical sample. *Id.* The district court was justified in not accepting any such comparison as a statistically significant basis for a disparate impact claim. *See id.*

Evidence was also offered at trial concerning hiring by the School District during the course of the 1986–87 school year, after the thirteen initial positions were filled. To whatever extent Lowe and Delisi contend that these subsequent events bolster their disparate impact theory, their argument fails. Three of the four teachers hired for elementary positions in February 1987 were over 40.

Similarly, Lowe and Delisi point to evidence of candidates under 40 being hired for the 1987–88 school year. But the School District claimed, and Lowe and Delisi did not dispute, that different hiring procedures were used for that school year. The results of those hiring practices therefore do not support Lowe's and Delisi's suit challenging the hiring practices for the 1986–87 school year. The School District contends that Lowe and Delisi did not even submit to the hiring process for the 1987–88 year. Lowe and Delisi are unable to point to any application by them, and they do not "identify[ ] the specific employment practice that is challenged" with respect to hiring for the 1987–88 year. *See Wards Cove,* —— U.S. at ——, 109 S.Ct. at 2124 (quoting *Watson,* —— U.S. at ——–——, 108 S.Ct. at 2788). They maintain only that "the commencement of this lawsuit was a sufficient manifestation of plaintiffs' desire to be hired." Lowe and Delisi have not presented a prima facie case based on the hiring procedures used for the 1987–88 school year.

■ Faced with hiring practices for the 1986–87 year that seem to have attracted and favored members of the protected group, Lowe and Delisi seek to recast the argument here by asking us to compare the effect of the hiring procedures on candidates over 50 with the effect on candidates under 50. Relying primarily on *Goldstein v. Manhattan Indus., Inc.,* 758 F.2d 1435 (11th Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985), they argue that age is inherently different from other characteristics such as race or sex and must therefore be treated differently for disparate impact purposes. In *Goldstein,* the Eleventh Circuit observed that

[a]ge discrimination is qualitatively different from race or sex discrimination in employment, because the basis of the discrimination is not a discreet and immutable characteristic of an employee which separates the members of the protected group indelibly from persons outside the protected group. Rather, age is a continuum along which the distinctions between employees are often subtle and relative ones.

758 F.2d at 1442. From this, Lowe and Delisi argue that "the fact that some of those hired were also within the protected class does not preclude a finding of age discrimination."

By recognizing the requirement that a prima facie case of disparate impact must show some disparate impact on the protected group, we in no way preclude a finding of age discrimination on the facts alleged by Lowe and Delisi. Thus, where discrimination occurs "within" a protected group, *e.g.,* where those in their fifties are discriminated against in favor of those in their forties, there is nothing to prevent a 55 year old plaintiff from prevailing on a disparate *treatment* claim. The use of disparate impact analysis is but one means of demonstrating age discrimination.

Indeed, the issue in *Goldstein* did not concern a disparate impact claim. The issue there was whether the test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for assessing prima facie cases of discrimination applied where a 60 year old plaintiff had been replaced by a 46 year old employee. A requirement derived from *McDonnell Douglas* that a plaintiff demonstrate that "he was replaced by a person outside the protected group" was found by the *Goldstein* Court to be overly strict and mechanistic in the context of the age discrimination claim of the plaintiff in that case. *Goldstein*, 758 F.2d at 1442–43 (quoting *Pace v. Southern Railway System*, 701 F.2d 1383, 1386 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983)); *cf. Montana v. First Federal Savings and Loan Ass'n*, 869 F.2d 100, 104–05 (2d Cir.1989). The *McDonnell Douglas* test, however, serves to evaluate prima facie cases of disparate treatment, not disparate impact. *See Geller*, 635 F.2d at 1032. Thus, neither *Goldstein*, nor analogous cases, *see Maxfield v. Sinclair International*, 766 F.2d 788, 792 (3d Cir. 1985) (citing cases), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986), support appellants' position that a disparate impact claim can be made out by showing that those in their forties were preferred over those in their fifties.

In recognizing the disparate impact approach of demonstrating discrimination, the Supreme Court generally has focused not on the individual plaintiff as much as on the adverse effect of the challenged practice *on the protected group* of which the plaintiff is a member. *See Watson*, —— U.S. at —— – ——, 108 S.Ct. at 2783–86; *see also Sobel v. Yeshiva University*, 839 F.2d 18, 28–29 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989). *But compare Teal*, 457 U.S. at 453–56, 102 S.Ct. at 2533–35, *with id.* at 456–63, 102 S.Ct. at 2535–39 (Powell, J., dissenting). As we said in *Geller*, disparate impact is present where a neutral practice " 'fall[s] more harshly on one group than another.' " 635 F.2d at 1031 (quoting *Teamsters*, 431 U.S. at 336 n. 15, 97 S.Ct.

at 1855 n. 15). Appellants in effect ask us to expand the disparate impact approach so as to include recognition of "sub-groups" in the analysis of the impact a hiring process has on the group that Congress has explicitly provided to be the protected group under the ADEA. Because Lowe and Delisi are in their fifties, they seek to define the protected group as those 50 or older. Under this approach, however, any plaintiff can take his or her own age as the lower end of a "sub-protected group" and argue that said "sub-group" is disparately impacted. If appellants' approach were to be followed, an 85 year old plaintiff could seek to prove a discrimination claim by showing that a hiring practice caused a disparate impact on the "sub-group" of those age 85 and above, even though all those hired were in their late seventies. We do not believe that such a "disparity" would support the inference of discrimination that the disparate impact approach permits when those outside a statutorily protected group are preferred over those included in that group. We find no support in the case law or in the ADEA for the approach to disparate impact analysis appellants advocate.

We also note that appellants' view of the law is inconsistent with our decision in *Geller*. There, a 55 year old plaintiff challenged a hiring practice on the basis of both disparate impact and disparate treatment. In considering the disparate impact claim, we looked only to the effect of the practice on the group Congress has specified is protected under the ADEA, those at least 40 years of age. *See Geller*, 635 F.2d at 1032–34. We did not examine whether subsets of the older members in the over–40 protected group were disparately impacted.

We do not believe that *Teal* compels a different result here. There, in a Title VII case, the Supreme Court found that a written test that constituted the first step in a promotion selection process and which had a disparate impact on Blacks could not be justified by the process' ultimate result of a proportional "bottom line." In rejecting such a defense, the majority indicated that:

Title VII does not permit the victim of a facially discriminatory policy to be told that he [or she] has not been wronged because other persons of his or her race or sex were hired. That answer is no more satisfactory when it is given to victims of a policy that is facially neutral but practically discriminatory. Every *individual* employee is protected against both discriminatory treatment and "practices that are fair in form, but discriminatory in operation."

457 U.S. at 455–56, 102 S.Ct. at 2535 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). Nevertheless, while rejecting the "bottom line" defense on this basis, the Court recognized that the plaintiff had presented a prima facie case by producing statistics demonstrating that the challenged test had had a disparate impact on members of the protected group, Blacks, who wished to proceed to the next step in the process. *Id.* at 442–44 & n. 4, 451, 102 S.Ct. at 2528–29 & n. 4, 2532.

Unlike the position rejected in *Teal*, our point here is not that discriminatory screening procedures applied by the School District to internal candidates are justified because eight of the thirteen available positions were ultimately filled by members of the protected group. Rather, we have undertaken to examine the impact of each step of the hiring process, and we conclude that none of those steps had any disparate impact on those 40 and over. Any internal candidate who wished to apply was allowed to participate in the interview and writing sample competition. Those who did apply were almost all members of the protected group, and the procedures used to exclude Lowe and Delisi were for the most part a means of choosing some members of the protected group over other members of the protected group. Indeed, it would have been impossible to narrow the field otherwise.

We recognized in *Geller* that the trial court is in the best position to analyze the statistics offered in a case such as this one. 635 F.2d at 1033–34. As we said there, "[w]here ... the statistical evidence, or its absence, leads to an indisputable result, the judge is justified in taking the evaluation of the statistics away from the jury." *Id.* at 1034. We find this to be such a case. The statistics offered led only to one "indisputable result"—members of the protected group were not disparately impacted. Lowe and Delisi failed to present a prima facie case of disparate impact, and the district court properly refused to charge the jury on that theory.

We reiterate that nothing we say here should be taken to preclude a plaintiff from prevailing on a disparate *treatment* claim where the "beneficiaries" of the discrimination, although younger than the plaintiff, are nevertheless themselves within the protected group of those 40 and over. *See, e.g., Maxfield*, 766 F.2d at 792–93; *cf. Air Line Pilots Ass'n v. Trans World Airlines, Inc.*, 713 F.2d 940, 952 & n. 13 (2d Cir.1983), *rev'd in part on other grounds*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Just such a claim of disparate treatment was submitted to the jury here. We now turn to the arguments Lowe and Delisi make in this appeal with respect to the trial of the disparate treatment claim.

## C. *The Jury Charge With Respect to Disparate Treatment*

■ Because the question of the defendants' motives was at issue with respect to Lowe's and Delisi's disparate treatment claim, much of the evidence and argument at trial went to the question of what factor age played in the School District's hiring decisions. Lowe and Delisi challenge as erroneous that part of the jury charge that instructed the jury on the question of the role age had to have played in the hiring decisions for Lowe and Delisi to recover on their claim of disparate treatment. Apart from the supplemental instruction discussed *infra*, Lowe and Delisi do not contend that the jury charge was in any other way erroneous. *Cf. Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1568–69 (2d Cir.1989) (court's charge under *McDonnell Douglas* erroneous where plaintiff offered direct evidence of discrimination).

As part of its charge to the jury, the district court stated:

> In order for plaintiffs to prove discrimination, the plaintiffs must show that age was a significant contributing factor for not hiring the plaintiffs.
>
> There is no issue here of whether or not the defendants' decision was a fair one or a wise one. In determining whether defendants treated plaintiffs less favorabl[y] because of their age, the plaintiffs are not required to show that age was the principal factor but must show the reasons offered were not the only reasons and that age was a significant contributing factor.
>
> Proof that the defendants' plan for hiring may not have been efficient or proper is immaterial, so long as the plan did not discriminate because of age.
>
> If age was a significant contributing factor for not hiring the plaintiffs, your verdict will be for the plaintiffs.
>
> If age was not a significant factor for not hiring the plaintiffs, your verdict will be for the defendants.

The district court subsequently repeated these instructions. In so charging the jury, the court rejected appellants' request to charge that their ages only had to have " 'made a difference' in the School District's decision." (quoting *Paolillo v. Dresser Industries, Inc.*, 865 F.2d 37, 40 (2d Cir.), *modified*, 884 F.2d 707 (2d Cir.1989) (in turn quoting *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983))).

Appellants argue that the district court should have provided the jury with a better explanation of what role age must have played in the decision not to hire plaintiffs for them to recover on their disparate treatment claim. Relying on our decision in *Paolillo*, they argue that the district court's charge "left it for the jury to speculate as to whether [the use of 'significant contributing factor'] simply meant that age had to make a difference or whether it had to be the real reason or a dominant reason." We disagree. The district court's charge left no room for such speculation.

In *Paolillo*, we reversed a judgment in favor of a defendant in an ADEA suit because the jury charge was erroneous. We noted that a plaintiff alleging age discrimination in an ADEA case "is not required to show that age was the *principal* factor in the employer's decision." 865 F.2d at 40. Rather, the plaintiff is "required to show only that the reasons offered by [the employer] were not its only reasons and that the age of [the plaintiff] 'made a difference' in its decision." *Id.* (quoting *Hagelthorn*, 710 F.2d at 82). For that reason, we held erroneous a jury charge that in order to find the defendant's offered reasons for implementing a termination program to be pretextual, the jury had to find that the " 'reasons given were not true, and that the *real* reason for the decision was the plaintiffs' age.' " *Id.* (quoting jury charge) (emphasis added by *Paolillo* panel). We stated clearly what we found to be troublesome about the jury charge. In our initial opinion, we stated "[w]e believe that the court's use of the word 'real' was confusing in that it failed to explain to the jury that age need not be the principal reason for [the employer's] decision ..., but only a significant contributing factor." *Id.*

In objecting to the district court's jury charge, Lowe and Delisi cited to the district court our then very recent *Paolillo* decision. The district court quite reasonably looked to the *Paolillo* decision and charged the jury as it did, using the "significant contributing factor" language we had used there. Were this the end of the story, appellants' argument would barely merit discussion.

Unbeknownst to the parties or the district court, however, as the jury charge was being given, the *Paolillo* panel was considering a petition for rehearing in that case. The petition for rehearing was denied, but the panel did amend its opinion. The amended opinion states "[w]e believe that the court's use of the word 'real' was confusing in that it failed to explain to the jury that age need not be the principal reason for [the employer's] decision ..., but only a factor that made a difference." *Paolillo*, 884 F.2d at 707.

The district court here cannot be faulted for following a recent decision of this Court and not anticipating a subsequent amendment to the opinion. Nevertheless, the amendment to *Paolillo* does bolster appellants' claim that their requested charge would have been more appropriate. We conclude, however, that when "viewed in its entirety and not on the basis of excerpts taken out of context," in light of the evidence in this case, the charge given adequately conveyed the applicable law to the jury. *United States v. Carr*, 880 F.2d 1550, 1554–55 (2d Cir.1989) (quoting *United States v. Clark*, 765 F.2d 297, 303 (2d Cir. 1985)). We therefore hold that "the instruction, though not ideal, was not erroneous." *Id.* at 1555.

Our concern in *Paolillo* was that use of the word "real" suggested that age had to be the principal factor motivating the employer's decision. A jury so instructed would be applying an erroneous reading of the law, one overly hostile to ADEA claims. Read in its entirety, however, the charge in this case did not create the confusion permitted by the charge used by the district court in *Paolillo*, namely the possibility that the jury might apply a "principal factor" standard. We think nothing in the phrase "significant contributing factor," when read in conjunction with the rest of the jury charge, suggested to the jury that age had to be the principal factor behind the School District's decision not to hire Lowe and Delisi. Indeed, as shown above, the charge taken as a whole would not permit any such misunderstanding of the law, as the court explicitly stated "the plaintiffs are not required to show that age was the principal factor."

## D. *Evidentiary Issue*

■ Lowe and Delisi called Joan Aberle as a witness. Aberle was one of the internal candidates who sought one of the thirteen positions at the start of the 1986–87 school year. With a writing sample score of 10.0 and a double "Yes" on her interview, the 54 year old Aberle had been placed in The Pool. She was not selected for one of the thirteen positions, however. She was hired in February 1987 to substitute for a teacher on maternity leave, which she did until June. During the summer of 1987, Aberle requested and was given an interview for the position of full-time substitute teacher for the upcoming 1987–88 school year. Appellants' offer of proof indicated that Aberle would testify that during the course of the interview, she was told by the interviewer, a school principal, "we are looking for young people." The district judge sustained defendants' objection to the proffered testimony. Appellants contend that the judge erred in refusing to admit Aberle's statement about her interview.

The decision of which evidence is admissible is one that is committed to the district judge's discretion. *See United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1193 (2d Cir.1989); *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1138 n. 7 (2d Cir.1979). We review a district judge's evidentiary rulings only for manifest error. *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 514 (2d Cir.1989) (citing *In re Martin–Trigona*, 760 F.2d 1334, 1344 (2d Cir.1985)). It appears from the transcript of the trial that the evidence was excluded because its probative value was substantially outweighed by its prejudicial effect. Fed.R.Evid. 403. This reasoning is supported by the testimony and offer of proof at trial. Judge Wexler's decision in this case constituted neither an abuse of discretion nor manifest error.

As our discussion *supra* indicates, the focus of appellants' case was on the hiring procedures used by the School District to fill the positions vacant at the start of the 1986–87 school year. The Aberle interview at issue here occurred during the process of hiring for the 1987–88 school year. The evidence appellants sought to elicit from Aberle thus concerned alleged discrimination in the hiring procedures used for the subsequent year. As we have noted *supra*, it seems that Lowe and Delisi did not even participate in the hiring process for that school year. Accordingly, defendants objected to the proffered testimony, stating that the testimony was "[w]ell after the

time period at issue in this case.... This is not relevant to the time period." The court thereupon sustained defendants' objection.

A showing that discriminatory hiring practices were used in a subsequent year might arguably be probative with respect to the practices used during the previous year. On the other hand, unique hiring practices used in different school years might have nothing to do with each other. The district court may have been attempting to keep the jury's attention properly focused on the issues surrounding the 1986–87 hiring. Under such circumstances, the district court, in its discretion, could properly exclude the testimony under Fed. R.Evid. 403.

That the district court was intent on keeping the trial testimony focused on the hiring year at issue is evident from the fact that the court did permit four witnesses to testify concerning a similar remark allegedly made by a member of the Board of Education of the School District during the summer of 1986, a period more contemporaneous with the 1986–87 school year hiring process.

Under these circumstances, we cannot say that it was manifest error or an abuse of discretion for the district court to exclude the testimony.

### E. *Comment by the Jury*

■ A few hours into its deliberations, the jury sent the district court a note, asking "[c]an we express our dissatisfaction with the polic[ie]s and procedures used for the hiring process in [19]86 in conjunction with our verdict[?]". The district court proposed to permit the jury to do so, but only after it filled out the verdict sheet. Counsel for appellants objected, telling the court, "[y]ou are giving them a way to compromise the decision as to the law." Counsel insisted that the jury should be told it could only say whether the defendants had discriminated against the plaintiffs.

In the presence of the jury, the court first read back the jury's note. The court then instructed, "[f]irst you must fill out your verdict sheet.... If the forelady or any one of you wish to make a statement, you may. But first that verdict sheet must be filled out." The jury then returned to its deliberations.

About twenty minutes later, the jury reported that it had reached a verdict. After the verdict in favor of the defendants was announced and recorded, the court declared the jury excused. The court then asked "[d]oes someone wish to say anything?" The forelady of the jury then stated, "[y]es. We feel that the hiring policies and procedures have a lot to be desired, and hope that in the future they use guidelines that they've outlined in Plaintiff's Exhibit 13." That exhibit was the letter written by Joseph Heinlein to Superintendent Del Rosso in January 1986, recommending consideration of certain factors in hiring teachers. *See supra.*

Appellants argue here that the district court erred in permitting the jury to make its statement without the court issuing a further instruction to guard against a compromise verdict.

We find nothing in our jurisprudence that says that it is improper for a court to permit the jury, after it has rendered its verdict and been excused, to make a statement regarding its opinion about the conduct of a defendant the jury has found to be not liable. Indeed, jurors often discuss publicly trials in which they have participated, as well as their jury deliberations. *See generally,* Note, *Public Disclosures of Jury Deliberations,* 96 Harv.L.Rev. 886 (1983).

Nothing about the substance of the forelady's statement is in any way inconsistent with its verdict. *Cf. Freeman v. Franzen,* 695 F.2d 485, 489–90 (7th Cir.1982), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). Indeed, the comment suggests to us that the jury was cognizant of the legal issue before it. In explaining the governing law, the district court properly charged the jury that "[t]here is no issue here of whether or not defendants' decision was a fair one or a wise one." The issue was whether the plaintiffs had

been discriminated against on account of their ages. The jury's comment suggests sympathy for the appellants and their misfortune in not being hired, along with displeasure with hiring procedures that seemingly placed performance in short interviews and a written test above the significance of appellants' years of satisfactory service in the School District. By channeling such feelings into its comment and not its verdict, the jury followed the court's instruction that unwise or unfair policies do not constitute illegal policies under the ADEA.

"[M]ere speculation will not suffice to prove that the jury [rendered a compromise verdict]." *See Luck v. Baltimore and Ohio R.R. Co.*, 510 F.2d 663, 668 (D.C.Cir. 1975). Appellants nevertheless ask us to speculate that the court's response to the jury's note had the effect of encouraging a compromise verdict. The suggestion is that some jurors would not have found for the defendants had they not been permitted to make their comment. They argue that the court should have further instructed the jury to guard against that possibility. Plaintiffs' argument fails.

We review a claim of error in a jury charge by determining "whether the entire charge, viewed in light of all of the evidence, would tend to confuse or mislead the jury as to the principles of law that apply to the facts." *National R.R. Passenger Corp. v. One 25,900 Square Foot More or Less Parcel of Land*, 766 F.2d 685, 688 (2d Cir.1985). In general, "we will reverse the judgment of a trial court ... because of an error in the jury instructions only if, based on a review of the record as a whole, we are persuaded that the error was prejudicial." *Id.; see* Fed.R.Civ.P. 61.

In its instructions, the court, after instructing the jury on the law, said:

> I remind you once again it's your responsibility to judge the facts in this case from the evidence admitted during the trial and to apply the law as I've given [it] to you. Your deliberations should include a rational discussion of the evidence in [the] case by all of you.

> In your deliberations you are entitled to your own opinion, but you should exchange views with your fellow jurors and listen carefully to each other. While you should not hesitate to change your opinion if you are convinced that another opinion is correct, your decision must be your own.

After instructing the jury that its verdict had to be unanimous, the court said, "[y]our oaths sum up your duty, that is, you will without fear or favor to any person conscien[t]iously and truly try the issues before you according to the evidence given to you in court."

We assume that the jurors heeded these instructions. *See United States v. Teitler*, 802 F.2d 606, 617 (2d Cir.1986). The issue plaintiffs raise, however, is whether the jury's question during its deliberations called for additional instruction from the court. We do not believe that it did. Granted, the jury returned a verdict very quickly after receiving an answer to its question. However, even if an inference could be drawn that the court's answer had an effect on the verdict, *cf. Arroyo v. Jones*, 685 F.2d 35, 40 (2d Cir.) (jury's return of verdict one-half hour after *Allen* charge indicated importance of charge to jury's verdict), *cert. denied*, 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982), there was nothing wrong with the answer itself and nothing inherent in the question asked by the jury that required further instructions regarding a compromise verdict. It is not unheard of for juries to make comments beyond a simple verdict. Other courts have allowed such comments. *See, e.g., Freeman*, 695 F.2d at 489–90. The concern facing the court at the time was whether its answer to the question might result in jurors not applying the law as they had been instructed to do. Aware of this concern, the district judge conditioned his affirmative response to the jury's question by stating that they would only be permitted to make a statement after they had filled out the verdict sheet. This instruction, in conjunction with those already given to the jury, was sufficient to protect against the jury's reaching a compromise verdict.

## CONCLUSION

The judgment of the district court is affirmed.

PIERCE, Circuit Judge, concurring:

### I.

I concur in the opinion of the majority except insofar as it takes the position that, under the Age Discrimination in Employment Act, a plaintiff may not introduce statistical evidence of discrimination against a subgroup of the protected age group in order to help establish a prima facie case of age discrimination. I believe the majority's refusal to recognize subgroups unduly restricts the scope of protection available to persons within the protected age group. Further, I believe such a position will impact most severely upon those most in need of the statute's protections.

Considering first the practical consequences of the majority's position, it is apparent that a failure to recognize subgroups in the context of ADEA claims ordinarily will have no adverse effect upon the ability of those on the lower end of the protected age group (those 40 years of age and slightly older) to successfully prosecute such claims. Generally, however, there will be an increasingly adverse effect due to such a failure which will occur in direct relation to a claimant's age. This is evident if one accepts as fact that "[s]eldom will a 60-year old be replaced by a person in [his] twenties." *McCorstin v. United States Steel Corp.*, 621 F.2d 749, 753–54 (5th Cir.1980). Instead, the likely beneficiary of discrimination against a 60-year old person will be another member of the protected group, *i.e.*, a person more than 40 years of age. Thus, "[i]f no intra-age group protection were provided by the ADEA, it would be of virtually no use to persons at the upper ages of the protected

class whose jobs require experience since even an employer with clear anti-age animus would rarely replace them with someone under 40." *Maxfield v. Sinclair Inter.*, 766 F.2d 788, 792 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). On the other hand, when a person who is only 40 years of age or slightly older suffers discrimination, a person *outside* the protected class is likely to benefit, *i.e.*, a person less than 40 years of age. Given the clear purpose of the Act, namely, to protect persons against discrimination due to age, it would indeed be strange, and even perverse, if the youngest members of the protected class were to be accorded a greater degree of statutory protection than older members of the class. I do not believe we should construe the Act so that it leads to such a result unless it is clear that in doing so we are carrying out the intent of Congress.

The ADEA expressly protects *individuals* against age discrimination. 29 U.S.C. § 631(a) (Supp. V 1987) ("individuals who are at least 40 years of age" are protected by the ADEA). Nothing in the statute suggests that when a member of the protected class is discriminated against on the basis of age, the extent of that individual member's rights should be contingent upon the age of the person who has benefited from that discrimination. The majority opinion, however, would raise this fortuity to the level of a dispositive factor in those instances where disparate treatment cannot be shown.

Nor is the majority's position supported by case law. In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court noted that "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." *Id.* at 432, 91 S.Ct. at 854.[1] For those at the upper end of the protected class, however, a refusal

---

1. While the Supreme Court in *Griggs* was construing Title VII of the Civil Rights Act of 1964, the Court has also noted that "the [substantive] prohibitions of the ADEA were derived *in haec verba* from Title VII." *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). In *Geller v. Markham*, 635 F.2d 1027,

1032 (2d Cir.1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981), we relied on *Griggs* in holding that proof of discriminatory impact can establish a violation of the ADEA. Such reliance upon *Griggs* is equally applicable here.

to recognize subgroups in disparate impact analysis is tantamount to limiting the protections of the ADEA to instances where discriminatory motivation can be shown. *See McCorstin*, 621 F.2d at 754. In my view, such a refusal goes against the "thrust" of Congress' intent, as the Supreme Court discerned that intent in *Griggs*. Several courts that have considered the issue of intra-age group protection in the context of ADEA claims based on disparate *treatment* have concluded that a failure to recognize subgroups would unduly eviscerate the protections of the ADEA. *Maxfield*, 766 F.2d at 792; *see Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1442 (11th Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *McCorstin*, 621 F.2d at 753–54. The rationale provided by these courts— that the oldest members of the protected class are entitled to protection equal to that given the youngest members of the class— should apply with equal force to ADEA claims based on disparate *impact.* I see no reason to distinguish between disparate treatment and disparate impact in this regard, and, indeed, I do not perceive a rationale for doing so in the majority opinion.

Additionally, I do not agree with the majority's contention that the approval of subgroups in this context would be "inconsistent with our decision in *Geller [v. Markham]*," 635 F.2d 1027 (2d Cir.1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). In *Geller*, a finding of disparate impact was *upheld.* It is true, as the majority notes, that "[w]e did not examine whether subsets of the older members in the over–40 protected group were disparately impacted." *Ante*, at 1373. We did not do so, however, because (1) such an examination was unnecessary to our decision, and (2) it appears that the issue was never raised. I believe the majority has unduly extended the reach of *Geller.* The fact that the *Geller* court did not opine beyond the requirements of the case as to the outer limits of the use of the disparate impact theory should not be construed as having established those limits *sub silentio.*

The majority correctly observes that "there is nothing to prevent a 55–year old plaintiff from prevailing on a disparate *treatment* claim. The use of disparate impact is but one means of demonstrating age discrimination." *Ante*, at 1372. Although this observation is correct, it is irrelevant. Disparate impact theory evolved precisely because in some circumstances discrimination of the type addressed by Congress existed, yet, disparate treatment theory proved insufficient to demonstrate the discrimination. *See Griggs*, 401 U.S. at 432–33, 91 S.Ct. at 854. The fact that implementation of the majority's position would only result in a partial evisceration of the ADEA's intended scope does not seem to me a convincing reason to adopt that position.

Finally, the majority's octogenarian versus septuagenarian hypothetical, *ante*, at 1373–1374, does not redeem its narrow view. In such a case, where the difference in age is slight, the district court might well "find the evidence was insufficient to permit an inference of discrimination." *Maxfield*, 766 F.2d at 793; *see Watson v. Fort Worth Bank and Trust*, —— U.S. ——, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 (1988) (plurality); *Geller*, 635 F.2d at 1033–34. Indeed, precisely that situation apparently occurred in this case, where the district court, finding the evidence insufficient, declined to charge the jury on disparate impact. In offering its hypothetical in support of its rejection of the use of subgroups, the majority has failed to distinguish the likelihood of a violation of a right from the propriety of recognition of that right. If an 85–year old person is in all respects qualified for a particular position and fails to attain that position for no reason other than age, s/he has suffered age discrimination under the Act and is entitled to the full benefit of the statute's protections.

In sum, I believe that Congress intended the ADEA to provide every employee over the age of 40 with protection "against both discriminatory treatment and 'practices that are fair in form but discriminatory in

operation,' " *i.e.*, in impact.[2] *Connecticut v. Teal,* 457 U.S. 440, 455–56, 102 S.Ct. 2525, 2535, 73 L.Ed.2d 130 (1982) (quoting *Griggs,* 401 U.S. at 431, 91 S.Ct. at 853). To achieve this end, we have approved the use of disparate impact theory in ADEA claims. *Geller,* 635 F.2d at 1032–34. The issue in this case is whether the reasons for allowing use of the disparate impact theory in the first place are sufficiently strong to mandate its *effective* use along the entire span of years of the protected age group. The majority contends they are not; for the reasons noted above, I respectfully disagree.

## II.

Notwithstanding my disagreement with the majority, I concur in the judgment of the court. Even assuming acceptance of the subgroup theory, I believe appellants have failed to demonstrate a prima facie case of disparate impact caused by a specific employment practice, as *Wards Cove Packing Co. v. Atonio* requires. —— U.S. ——, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989). The nearest appellants come to establishing such a practice is with regard to the interview process; however, the difference in the interview results between those older than 50 and those younger than 50 seems truly *de minimus* herein. To establish a prima facie case of discrimination utilizing the disparate impact theory, "a plaintiff must show that the facially neutral employment practice had a *significantly* discriminatory impact," *Teal,* 457 U.S. at 446, 102 S.Ct. at 2530 (emphasis added); clearly, no such "significantly discriminatory impact" was demonstrated here.

**2.** Although the Supreme Court accepted the disparate impact theory in 1971, *see Griggs,* 401 U.S. at 431, 91 S.Ct. at 853, the Court did not use the term "disparate impact" until 1977, *see Inter-*national *Bhd. of Teamsters v. United States,* 431 U.S. 324, 336 n. 15, 97 S.Ct. 1843, 1855 n. 15, 52 L.Ed.2d 396 (1977).