Sheila DUNCAN, Plaintiff,

v.

**NEW YORK CITY TRANSIT AUTHORITY and Manhattan and Bronx Surface Transit Operating Authority, Defendants.**

**No. 97 CV 4651(NG).**

United States District Court,
E.D. New York.

Jan. 24, 2001.

Joel Field, New York City, for plaintiff.

Dorothea Regal, Hoguet Newman & Regal, LLP, New York City, for defendants.

## *ORDER*

GERSHON, District Judge.

Plaintiff Sheila Duncan brings this action against defendants New York City Transit Authority, and Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA") (collectively "Transit"), alleging discrimination on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") as amended, 29 U.S.C. §§ 621 *et seq.,* and the New York State Human Rights Law ("HRL"), New York State Executive Law §§ 290 *et seq.;* and discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, 42 U.S.C. §§ 2000(e) *et seq.,* and the HRL.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) dismissing plaintiff's claims in their entirety. Defendants argue that plaintiff has failed to establish a prima facie case of age or race discrimination in violation of the ADEA, Title VII and the HRL, and, alternatively, that plaintiff cannot show that the stated legitimate, non-discriminatory reason for her termination was a pretext for discrimination.

### Facts

Unless otherwise indicated, the following facts are undisputed.

Plaintiff Sheila Duncan is an African–American female who was born on January 12, 1949. Plaintiff has a High School diploma, but did not attend college. She began working for MaBSTOA, a subsidiary of the New York City Transit Authority, on February 22, 1971, as a clerk typist in the Personnel Department of the Materiel Division ("Materiel"). Then on August 25, 1971, plaintiff was transferred to the Purchasing Department of Materiel, where she remained until her termination in 1995. During her employment, plaintiff was promoted from clerk typist, to assistant buyer, to buyer, to senior buyer, to supervising buyer, and finally to procurement specialist. In 1994, Bonnie Hickey, plaintiff's supervisor, carried out a series of evaluations. On three occasions, plaintiff received a good, the second highest score on a scale of four, for her job quality, initiative, and overall performance. On two evaluations, under the heading "initiative," Ms. Hickey comments that plaintiff shares ideas and suggestions, and on the third evaluation, Ms. Hickey comments that "[w]hen called upon, Ms. Duncan will offer suggestions and ideas." However, in 1987, plaintiff was disciplined for tardiness. Further, in March 1995, Ms. Hickey reprimanded plaintiff for excessive absenteeism, and reduced plaintiff's paycheck, because plaintiff took approximately 9 sick days in 1990; 18 sick days in 1991; 24 sick days in 1992; 19 sick days in 1993; 22 sick days in 1994; and 10 sick days in the first half of 1995.

On July 1, 1995, plaintiff and five other procurement specialists were terminated pursuant to a reduction in force ("RIF"). Earlier that year, Materiel had determined that it would eliminate 6 of its 115 procurement specialists to comply with a general RIF that Transit was carrying out for budgetary reasons. In order to make these cuts, defendants set up an RIF Task Force, which in turn designed a ranking system. The ranking system gave job knowledge, education, experience, and computer skills a weight of 5 each; absenteeism, communication, initiative, and analytical and interpersonal skills a weight of 10 each; and quality and quantity of output a weight of 15 each. The ranking system then gave employees a score of one to eight in each category, and multiplied

that score by the category's weight. Finally, the ranking system added the weighted scores in each category, and terminated the six employees with the lowest total scores. In weighing education, college graduates received a good or better (over 25 points); employees with some college work but not a degree received a marginal (15 to 20 points), and employees with only a high school education received a poor (10 points). In weighing experience, the ranking system equated experience acquired in Materiel with other transit experience.

Plaintiff tied for the sixth lowest overall score at 450. Her weighted scores in each category were as follows: education (10); experience (30); absenteeism (10); computer skills (25); job knowledge (25); communication skills (50); analytical skills (50); interpersonal skills (60); quantity of output (75); quality of output (75); and initiative (40). Because plaintiff challenges her quality of output and initiative scores as inconsistent with her previous rankings, I note that the quality of output score corresponds to a "good," which is the second highest score on a scale of four, and plaintiff's initiative score corresponds to a "marginal," the third highest score, which describes an employee who "[f]requently avoids more difficult assignments. More comfortable with status quo. Occasionally extends his/her role with prodding." Thus, on June 7, 1995, defendants' informed plaintiff that she would be terminated at the end of the month.

The number of procurement specialists of each class (and the percentage of Materiel procurement specialists of each class) before and after the RIF were:

|  | Before the RIF | After the RIF |
| --- | --- | --- |
| African–American | 41 (36%) | 37 (34%) |
| Non–African–American | 74 (64%) | 72 (66%) |
| Age–Protected | 62 (54%) | 58 (53%) |
| Non–Age–Protected | 53 (46%) | 51 (47%) |

Thus, 90% of African–American procurement specialists in Materiel passed the RIF, while 97% of non-African-American procurement specialists in Materiel passed. The ratio of African–American procurement specialists who passed to non-African-American procurement specialists who passed is 93%. In addition, 93% of age-protected procurement specialists in Materiel passed the RIF, while 96% of non-age-protected procurement specialists in Materiel passed. The ratio of age-protected procurement specialists who passed to non-age-protected procurement specialists who passed is 97%.

Plaintiff, rejecting the significance of these figures, relies on the fact that, of the six terminated procurement specialists, four were African–American, and four were age-protected. Further, plaintiff relies on the fact that the number of Materiel procurement specialists of each class (and the percentage of that class) with a college degree prior to the RIF was:

|  | College Graduate | Not College Graduate |
| --- | --- | --- |
| African–American | 20 (49%) | 21 (51%) |
| Non–African–American | 55 (74%) | 19 (26%) |
| Age–Protected | 32 (52%) | 29 (48%) |
| Non–Age–Protected | 43 (80%) | 11 (20%) |

While the Task Force was in place, Materiel hired two non-African-American and non-age-protected procurement specialists. Transit hired Mr. Havaldar straight into Materiel on January 9, 1995, and transferred Mr. Nisnevich into Materiel on April 22, 1995. However, Materiel evaluated both new employees under the RIF. Further, on June 12, 1995, several days after plaintiff was informed of her termination, defendants transferred Carlos Torres, a non-African-American, non-age-protected procurement specialist, into Materiel. However, Mr. Torres was hired as a negotiator for his outsourcing skills, which plaintiff did not possess. Pursuant to Transit policy, plaintiff received a one year hiring preference, but there were no vacancies between June 1995 and June 1996. Several times in 1997 and 1998, Materiel sought applications for procurement specialists. Materiel hired six new procurement specialists and rehired one specialist who had been laid off under the RIF. Six of the seven new procurement specialists were non-African-Americans, and six of the seven new procurement specialists were non-age-protected.

Plaintiff alleges that she applied for several of these positions. In her deposition, plaintiff states that she "probably" applied for three positions that were not limited to current employees. However, there is no documentary evidence that plaintiff applied as required by the employer. She was represented by an attorney during the period that Transit was seeking applications. Her attorney wrote a letter to Transit requesting priority for his client in obtaining these positions. Plaintiff's counsel also stated that "this letter is to be considered as an application by Sheila Duncan for each and every vacant procurement position in the Materiel Division." Transit responded that, pursuant to Transit policy, plaintiff received priority in rehiring only for one year and that, if she wished to apply, she would have to follow procedure and submit a formal written application for each position. However, plaintiff supplies no documentation that plaintiff did so.

## Discussion

### Summary Judgment Standard

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In a discrimination action such as this, it is important to note that:

> [a] victim of discrimination is ... seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence .... Consequently, in a Title VII action, where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate.

*Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991) (citations omitted). On the other hand, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).

### Race and Age Discrimination Under Title VII, the ADEA, and the HRL

■ Plaintiff proceeds under both disparate impact and disparate treatment theories. Under a disparate impact theory, a plaintiff must show that a facially neutral employment practice falls more harshly on a protected group. Under a disparate treatment theory, a plaintiff must prove that an employer intentionally discriminated against a member of a protected class. *See Dist. Council 37, American Fed. of State, County & Municipal Employees, AFL–CIO v. New York City Dep't of Parks and Recreation,* 113 F.3d 347, 351 (2d Cir.1997). The standard of proof governing an employment discrimination claim raised under the New York HRL is the same as the standard of proof for a Title VII or an ADEA claim. *See Sogg v. American Airlines, Inc.,* 193 A.D.2d 153, 155–56, 603 N.Y.S.2d 21 (1st Dep't 1993).

■ **1. Disparate Impact:** While the Supreme Court has not yet decided whether the disparate impact doctrine applies to ADEA claims, *See Hazen Paper v. Biggins,* 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the Second Circuit continues to hold that disparate impact claims can be made under the ADEA. *See Dist. Council 37,* 113 F.3d at 351. In order to establish a prima facie case, plaintiff must demonstrate that 1) she is a member of a protected class; and 2) a challenged employment practice had a significant disparate impact on that class, so as to evidence a causal connection between the specific factor challenged and the disparate impact. The burden then shifts to the employer to show that the challenged practice had a legitimate purpose. Finally, if the defendant meets this burden, the plaintiff must show that the proffered purpose is pretextual. *See Fernandez v. U.S. Postal Service,* 804 F.Supp. 448, 452 (E.D.N.Y.1992); *Dist. Council 37,* 113 F.3d at 351–52. Under the disparate impact theory, proof of a disparity can be demonstrated through statistical analysis which compares the impact of a particular employment action on a protected class with the impact upon qualified employees in the relevant labor pool. *See Diehl v. Xerox Corp.,* 933 F.Supp. 1157, 1165 (W.D.N.Y. 1996). An employer has the "right to decide the qualifications it require[s]" in deciding which employees to terminate, so long as the terminations do not have a disparate impact. *Florence v. U.S. Vanadium Corp.,* 162 F.3d 1147, 1998 WL 639395, *3 (2d Cir.1998). A plaintiff can prove significant disparate impact either through gross statistical disparity, or a statistically significant adverse impact coupled with other evidence of discrimination. *See Fernandez,* 804 F.Supp. at 452.

■ Plaintiff is an African–American who is over forty years of age. Plaintiff argues that, as a result of the RIF giving education and experience the same weight, and its equating of internal experience with external experience, the RIF had a disparate impact on African–Americans and employees over forty years of age. Plaintiff relies on the administrative four-fifths rule of the Equal Employment Opportunity Commission. This rule, which has been looked to for guidance in gauging the significance of statistical evidence of discrimination, *Equal Employment Opportunity Commission v. Joint Apprenticeship Comm.,* 164 F.3d 89, 97 (2d Cir.1998), states that:

> A selection rate for any race, sex, or ethnic group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nonetheless constitute adverse impact, where they are significant in both statistical and practical terms . . . .

*Id.;* 29 C.F.R. § 1607.4D. Plaintiff argues that the ratio of age-protected procure-

ment specialists with a college education to non-age-protected procurement specialists with a college education prior to the RIF was 65%, and the ratio of African–American procurement specialists with a college education to non-African-American procurement specialists with a college education was 66%. Since both rates are below the 80% required by the four-fifths rule, plaintiff argues there is evidence of an adverse impact.

This is a misapplication of the four-fifths rule because the relevant selection factor is the pass rate of the RIF as a whole. When a component of an overall selection process is not dispositive, "the selection process as a whole, rather than any segment of it, should be examined for disproportionate impact in a Title VII case," because to "examine each component of an entire application process ... launches a court on a course that has no boundaries and no clear end.... The prospect of a court's examining subtests, sub-subtests, and even individual questions within test segments argues in favor of examining only the end result of an entire [ ] process." *Brown v. New Haven Civil Service Bd.*, 474 F.Supp. 1256,1261–62 (D.Conn. 1979). A subtest is the relevant selection factor where the subtest is dispositive, but where "all of the candidates participate in the entire [employment] process, and the overall results reveal no significant disparity of impact, scrutinizing individual [steps] would, indeed, 'conflict[ ] with the dictates of common sense.'" *Dist. Council 37,* 113 F.3d at 353 (citation omitted). In this case, college education was not dispositive because the RIF was a multi-component process where an employee, who lacked a college education and thus received a low education score, was nevertheless not precluded from passing the overall test by scoring well in other components. Nor does *Waisome v. Port Authority of New York and New Jersey,* 948 F.2d 1370 (2d Cir.1991), compel a different result because, in that case, the test at issue was both a dispositive step, and a factor in the

overall score. *See Dist. Council 37,* 113 F.3d at 354.

In addition, plaintiff improperly relies upon the fail rate. The pass rate compares the number of protected employees who pass a test to the number of non-protected employees who pass the test. The Second Circuit has held that this method, rather than comparing the number of protected employees who fail a test to the number of non-protected employees who fail a test, should be used because the number of failing employees is usually too small to produce statistically reliable results. *See Joint Apprenticeship Comm.,* 164 F.3d at 97. Using the fail rate would produce a statistically unreliable result in this case, where only six employees were terminated. *See Pulitzer v. New Hartford Central Schools,* 1998 WL 187410 *5–*6 (N.D.N.Y.1998) (granting defendant's summary judgment motion in an ADEA case because a sample of six is too small to be of probative value). While the fact that two-thirds of the terminated employees were African–American, and two-thirds were age-protected, initially may appear significant, the probative value of this evidence "is greatly diminished by the small number of people involved." *Coleman v. Prudential Relocation,* 975 F.Supp. 234, 240, 245 (W.D.N.Y.1997). The ratio of passing African–Americans to passing non-African-Americans is 93%, and the ratio of age-protected employees to non-age-protected employees is 97%. Both these ratios are above the 80% required by the four-fifths rule to show an adverse impact. Since this is the only statistical evidence plaintiff offers of disparate impact, plaintiff has failed to show a material factual issue genuinely in dispute as to a prima facie case under this theory.

In any event, even if plaintiff could make a prima facie showing of disparate impact, plaintiff fails to show a genuine issue of material fact to support her claim that her termination was pretextual. Defendants have shown a legitimate business reason for terminating the six procurement spe-

cialists, namely budgetary constraint. A "reduction-in-force and reorganization of staff constitutes a legitimate nondiscriminatory reason for employment related decisions . . . . [but] even during a legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons." *Maresco v. Evans Chemetics*, 964 F.2d 106, 111 (2d Cir.1992) (quotation omitted). The small changes in the composition of Materiel's workforce is clearly insufficient to show that this legitimate business reason was a pretext. *See Thayne v. New York State Electric & Gas Corp.*, 1997 WL 727617 *8 (N.D.N.Y.1997). Thus, defendants are entitled to summary judgment under a disparate impact theory.

■ **2. Disparate Treatment:** Under disparate treatment analysis, a plaintiff first must establish a prima facie case of disparate treatment by demonstrating that: (1) she belongs to a protected class; (2) she was performing satisfactorily; (3) she was discharged; and (4) the decision to discharge occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994). Once a prima facie case has been made, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If this is done, the *McDonnell Douglas* presumptions disappear, and the governing standard is whether the particular evidence, taken as a whole, reasonably supports an inference of the facts plaintiff must prove, particularly intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *James v. New York Racing Assoc.*, 233 F.3d 149, 156–57 (2d Cir.2000). Plaintiff must "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Services Ltd., Partnership*, 22 F.3d 1219, 1225 (2d Cir.1994). Evidence satisfying the prima facie requirement, coupled with evidence of the falsity of the employer's explanation, may or may not be sufficient to satisfy a finding of discrimination in a particular case. The factors to consider include the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and other evidence that supports or undermines the employer's case. *See Reeves*, 120 S.Ct. at 2109; *James*, 233 F.3d at 156–57.

Even assuming that plaintiff makes a prima facie case of discrimination, the requirements of which are minimal, defendants, as described above, have proffered a legitimate reason for terminating plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Thus, the issue is whether the circumstances will logically support an inference that plaintiff's age or race was a substantial motivating factor in defendants' decision to terminate her. *See Burger v. New York Institute of Technology*, 94 F.3d 830, 834 (2d Cir.1996).

■ Plaintiff points to four circumstances that she claims logically support an inference of discrimination. First, plaintiff points to discrepancies between plaintiff's 1994 performance evaluations and her score on the 1995 RIF regarding her job quality and initiative. The first alleged discrepancy cannot be sustained because plaintiff received a "good" for job quality on both her performance evaluations and the RIF. As for her initiative, plaintiff received a good on her performance evaluations, but a raw score of four on the RIF. Four is "marginal" on the

RIF, but only one point below good. Furthermore, the descriptions underlying these labels reveal no discrepancy sufficient to reasonably support a conclusion that plaintiff's RIF ranking was motivated in substantial part by discrimination. The RIF's description of a marginal employee as one who often avoids difficult assignments and occasionally extends her role with prodding is not significantly inconsistent with the comments plaintiff received on her performance evaluations, which include Ms. Hickey's comment that "[w]hen called upon, Ms. Duncan will offer suggestions and ideas."

■ Second, plaintiff argues that a jury could reasonably infer that discrimination was a substantial motivating factor from Materiel's hiring of Mr. Havaldar and transfer of Mr. Nisnevich, both non-African-American and non-age-protected procurement specialists, when Materiel knew it would be making terminations pursuant to the RIF. Plaintiff acknowledged at oral argument that Mr. Havaldar and Mr. Nisnevich filled vacancies. No inference of discrimination can be drawn from the fact that defendants made a business decision to fill vacancies. Furthermore, unlike in *Burger*, 94 F.3d at 834, the RIF would have occurred whether or not Mr. Havaldar and Mr. Nisnevich came into Material. Finally, defendants treated plaintiff the same as Mr. Havaldar and Mr. Nisnevich, because it subjected them all to the same rating process. *See McDonnell Douglas*, 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668.

■ Third, plaintiff argues that transferring Mr. Torres, a non-African-American and non-age-protected employee, into Materiel several days after plaintiff received notice of her termination suggests that defendants acted with a discriminatory motive. Defendants offer evidence that Materiel hired Mr. Torres as a negotiator because of his outsourcing skills, which plaintiff did not possess. Plaintiff offers no evidence to demonstrate that plaintiff was qualified for Mr. Torres' position.

Since Mr. Torres and plaintiff were not similarly situated and plaintiff has not even shown she was qualified for the position he received, the transfer of Mr. Torres does not support a reasonable inference that intentional discrimination was a substantial motivating factor in plaintiff's termination. *See McDonnell Douglas*, 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668.

■ Fourth, plaintiff argues that defendants' failure to rehire plaintiff when defendants had procurement specialist vacancies in 1997 and 1998 supports an inference that discrimination was a substantial motivating factor in her termination. Plaintiff does not raise an independent claim of failure to rehire. Rather, she argues that defendants' failure to hire plaintiff when openings became available is circumstantial evidence that discrimination was a substantial motivating factor in the earlier decision to terminate her. However, defendants' business decision to hire seven employees two to three years after plaintiff's termination does not circumstantially and retroactively reflects on defendants' earlier decision to terminate plaintiff. "That an employer reconsiders its business strategy and consequently rehires an employee ... does not, without more, cast any doubt on the economic justification for the earlier termination." *Florence*, 1998 WL 639395, *3. *Gallo*, 22 F.3d at 1227, does not compel a contrary conclusion because defendants undertook no obligation to rehire plaintiff beyond one year in this case. *See Viola v. Philips Medical Systems of North America*, 42 F.3d 712, 718 (2d Cir.1994) (declining to apply *Gallo* where an employer undertook no obligation to rehire a former employee).

Furthermore, these subsequent hirings do not support a discrimination claim because no reasonable fact-finder could conclude from the evidence taken as a whole that plaintiff applied for the subsequent openings. Although plaintiff was represented by counsel and her attorney was

told she had to submit written applications, plaintiff failed to do so. In sum, no reasonable fact-finder could conclude that age or race discrimination was a substantial motivating factor in plaintiff's termination. There is no direct evidence of discrimination and the circumstantial evidence relied upon by plaintiff is insufficient.

### Conclusion

Defendants' motion for summary judgment is granted, and the Clerk of Court is directed to enter judgment for defendants.

**SO ORDERED.**